UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TRACFONE UNLIMITED SERVICE PLAN LITIGATION | No. C-13-3440 EMC |
| _____/ | **ORDER (1) GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND (2) GRANTING MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND REPRESENTATIVE SERVICE AWARDS**<br><br>**(Docket Nos. 121, 122)** |

## I.   INTRODUCTION

Class Plaintiffs filed four consolidated class actions against Defendant TracFone Wireless, alleging that TracFone sold "unlimited" data plans that were not, in fact, unlimited.  Rather, when TracFone's customers exceeded certain data usage caps, TracFone would throttle[1] or suspend those customers' data service altogether, or even terminate their phone services entirely.  Plaintiffs claim this behavior violated numerous laws, including California's Unfair Competition Law (UCL), its Consumer Legal Remedies Act (CLRA), Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), as well as numerous common-law proscriptions.  The Federal Trade Commission (FTC) also alleges that TracFone's advertising of its "unlimited" data plans was deceptive, and filed a separate enforcement action that has been related to this case.  *See Federal Trade Commission v. TracFone Wireless, Inc.*, Case No. 15-cv-00392-EMC.  TracFone has settled the FTC enforcement

---

[1] Throttling is the slowing of a customer's data service speed.

United States District Court<br>For the Northern District of California

United States District Court

For the Northern District of California

1    action as part of a global resolution of these class actions.

2         The parties to the consumer cases now seek final approval of a nationwide settlement of all

3    claims stemming from TracFone's allegedly deceptive marketing practices.  Class counsel also

4    move for an award of attorneys' fees and costs, and for service awards for the named plaintiffs.

5    Pursuant to the terms of the proposed settlement, TracFone has paid $40 million to the FTC that the

6    FTC will disburse to class members in accordance with an agreed upon payment formula.

7    Depending on the precise injury a class member experienced (*i.e.*, whether their service was

8    throttled, suspended, or terminated) and when that injury occurred, class members who made a claim

9    will receive between roughly $15 and $65 per affected phone line.  TracFone further agreed to the

10   entry of injunctive relief regarding its advertising and disclosure practices with respect to its

11   "unlimited" data plans.

12        1.8 to 1.9 million customers for whom TracFone has up-to-date address information will

13   automatically receive a payment under the settlement without filing a claim.  All other class

14   members are required to submit a simple claims form to recover under the settlement.  The deadline

15   to file claims passed on June 19, 2015.  The deadline for opt-outs and objections passed on May 20,

16   2015.  The settlement administrator reports that 803,671 claim forms were submitted as of June 22.

17   Docket No. 139 (Second Supp. Decl. Simmons) at ¶ 8.  By contrast, 142 putative class members

18   opted out, and five objected to the settlement.  Docket No. 134-1 (Supp. Decl. Simmons) at ¶¶ 22,

19   23.  Of those five objectors only two, Objectors Birner and Johnson, filed substantive objections.

20   And of those, only Birner appeared at the fairness hearing, is represented by counsel, and filed a

21   formal objection to the settlement complete with legal citations.  However, as discussed more fully

22   below, the Court concludes that Birner lacks standing to object because he is not a class member.  In

23   any event, the Court determines that his objection is without merit.

24        For the reasons explained in this Order and stated on the record at the final approval hearing,

25   the Court determines that the parties' proposed settlement is fair, reasonable, and adequate.  It is

26   therefore approved.  Similarly, the Court determines that class counsels' fees request is eminently

27   reasonable in light of the sizeable relief obtained for the class.  Accordingly, class counsel will be

28   awarded the full $5 million sought in fees, plus the full amount of their requested costs ($63,644.75).

United States District Court
For the Northern District of California

1    Finally, the Court approves the payment of $2,500 service awards to the representative plaintiffs.

2                              **II.    DISCUSSION**

3    A.        Motion for Final Approval of Class Action Settlement

4              1.        Legal Standard for Final Approval

5              Federal Rule of Civil Procedure 23(e) "requires the district court to determine whether a

6    proposed settlement is fundamentally fair, adequate and reasonable." *Hanlon v. Chrysler Corp.*, 150

7    F.3d 1011, 1026 (9th Cir. 1998). "It is the settlement taken as a whole, rather than the individual

8    component parts, that must be examined for overall fairness." *Id.* (citing *Officers for Justice v. Civil*

9    *Serv. Comm'n of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982)).

10             While the factors this court may consider in making its fairness assessment will naturally

11   vary from case to case, typically the court should consider:

12                        (1) the strength of the plaintiff's case; (2) the risk, expense,
                          complexity, and likely duration of further litigation; (3) the risk of
13                        maintaining class action status throughout the trial; (4) the amount
                          offered in settlement; (5) the extent of discovery completed and the
14                        stage of the proceedings; (6) the experience and views of counsel; (7)
                          the presence of a governmental participant; and (8) the reaction of the
15                        class members of the proposed settlement.

16   *In re Bluetooth Headset Prods. Liab. Litig.* (*In re Bluetooth*), 654 F.3d 935, 943 (9th Cir. 2011)

17   (citing *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F. 3d 566, 575 (9th Cir. 2004)).

18             Moreover, "where, as here, a settlement is negotiated *prior* to formal class certification,

19   consideration of the[] eight *Churchill* factors alone is not enough to survive appellate review." *In re*

20   *Bluetooth*, 654 F.3d at 946 (emphasis in original). Rather, a reviewing court must also be on the

21   lookout for "subtle signs that class counsel have allowed pursuit of their own self-interests and that

22   of certain class members to infect the negotiations." *Id.* According to the Ninth Circuit in

23   *Bluetooth*, such "warning signs" include: (1) where "counsel receive a disproportionate distribution

24   of the settlement, or when the class receives no monetary distribution;" (2) where the "parties

25   negotiate a 'clear sailing' agreement providing for the payment of attorneys' fees separate and apart

26   from class funds;" and (3) where "the parties arrange for fees not awarded to revert to defendants

27   rather than to be added to the class fund." *Id.* (citations omitted).

28

                                                  3

**United States District Court**
For the Northern District of California

1

2.     <u>Analysis of the *Churchill Village* and *In re Bluetooth* Factors</u>

2

    a.     <u>Strength of the Plaintiffs' Case</u>

3         TracFone admits it throttled or suspended its customers' data service, and occasionally even

4 terminated its customers' TracFone service altogether where those customers exceeded certain

5 monthly data caps. The gravamen of Plaintiffs' complaint is that these data caps were not

6 adequately disclosed to consumers when they signed up for the service. Rather, TracFone

7 advertised that the relevant phone plans offered "unlimited" data.

8         The strength of the Plaintiffs' case appears to hinge largely on the viability of three separate

9 defenses, two substantive and one procedural. TracFone's first substantive defense is that it

10 adequately disclosed the existence of the data cap in its Terms & Conditions, and thus no reasonable

11 consumer could have been materially misled by its "unlimited" advertisements. Indeed, this is the

12 same (and only) substantive point raised by Objector Johnson: According to Johnson, TracFone

13 should not have to pay *any* damages because consumers should have known they would be throttled,

14 suspended, or terminated if they exceeded the data caps. *See* Docket No. 134-1, Ex. D (Johnson

15 Objection). Ultimately, the Court believes this putative defense (and associated objection) is not

16 particularly strong – the typical consumer would likely rely on the veracity of the widely publicized

17 "unlimited" advertising claims, and thus have little motivation to root around in TracFone's lengthy

18 form contract to learn that TracFone's definition of "unlimited" data ran counter to the plain and

19 ordinary meaning of that term.

20         TracFone's other substantive defense, however, appears much stronger. TracFone first

21 argues that a substantial number of class members who were throttled likely did not know that their

22 data speed had been slowed, and thus suffered little, if any, cognizable injury even if they reasonably

23 relied on TracFone's allegedly misleading advertisements. Moreover, TracFone argues that those

24 consumers who *did* notice the throttling sustained only limited damages, particularly given the

25 month-to-month duration of TracFone's service plans.[2] Put simply, TracFone argues that if a

26 consumer became aware of the throttling, and nevertheless chose to sign additional monthly

27 _____

28       [2] TracFone customers receive TracFone's services pursuant to monthly contracts that a customer can choose to let lapse without paying a penalty.

1  contracts with TracFone, that consumer was no longer misled by the "unlimited" advertisements.

2  Rather, such a class member *knew* that the "unlimited" advertisements were false, and chose to

3  purchase TracFone's product anyway.

4      Finally, TracFone argues that Plaintiffs' claims were unlikely to succeed as a procedural

5  matter because they were likely to be compelled to individual arbitration pursuant to an arbitration

6  clause contained in the Plaintiffs' service agreement with TracFone.  This possibility is discussed in

7  the following section regarding the risks of this litigation.

8      As to the first *Churchill Village* factor, the Court concludes that while the Plaintiffs' case

9  appears strong, TracFone is not without plausible defenses that could have ultimately left class

10  members with a reduced or non-existent recovery.  Thus, the first factor favors approval of this

11  settlement.

12          b.      The Risk, Expense, Complexity, and Likely Duration of Further Litigation

13      The second *Churchill Village* factor also favors settlement.  Specifically, the proposed

14  settlement offers class members prompt relief without the expense and hassle of what would be

15  protracted litigation if this case cannot be resolved amicably.

16      First, it cannot be denied that this litigation is complex.  There are four separate consumer

17  lawsuits pending against TracFone, along with an FTC enforcement action, alleging violations of

18  various laws of at least three different jurisdictions.  Moreover, the alleged wrongful conduct at

19  issue took place over a considerable period of years, during which time TracFone's advertisements

20  and disclosures apparently materially changed at least once, thereby admitting further legal and

21  factual variation that could quickly ratchet up the complexity of this case.

22      As noted above, there are also some notable litigation risks that could threaten, reduce, or

23  even eliminate Plaintiffs' recovery entirely.  Most notably, TracFone filed motions to compel

24  arbitration in each of the consumer cases pursuant to a contractual arbitration clause in its Terms &

25  Conditions that contains a class action waiver.  TracFone notes that various federal courts have

26  previously concluded that TracFone's terms of service are binding on consumers, and those terms of

27  service include the arbitration provision asserted in these actions.  *See, e.g.*, *TracFone Wireless, Inc.*

28  *v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1315 (S.D. Fla. 2010) (holding that TracFone shrinkwrap

United States District Court

For the Northern District of California

1   agreement, with similar language to agreement at issue here, was enforceable contract against phone

2   purchasers); *TracFone Wireless, Inc. v. Bequator Corp. Ltd.*, No. 10-cv-21462 (WMH), 2011 WL

3   1427635, at *8 (S.D. Fla. Apr. 13, 2011) (same).  Thus, TracFone contends that Plaintiffs would be

4   unlikely to recover damages at all if litigation continues and the motions to compel individual

5   arbitration are litigated to completion.

6          Plaintiffs concede that TracFone's successful invocation of the arbitration clauses is a

7   significant risk they face if they go forward in this litigation absent settlement, although they

8   contend that they have strong defenses to the enforceability of the arbitration clause.  Objector

9   Birner, however, argues that even Plaintiffs have exaggerated the risks of arbitration; in his view the

10  arbitration clause is plainly unenforceable as a matter of California law because it is both

11  procedurally and substantively unconscionable.  Objection at 17-21.  Even if Birner had standing to

12  object, and he does not, this objection is without merit.  First, it is not immediately apparent that

13  California law would govern the enforceability of the arbitration provision.  While the relevant

14  contract's choice-of-law provision provides that the contract shall be construed under the laws of

15  Florida, the contract specifically exempts the arbitration provision from the choice-of-law clause,

16  and does not specify what law should apply to the arbitration clause.  Docket No. 51-1, Ex. 1 to

17  Decl. Levine at ¶ 16.  Thus, the Court would likely need to apply choice of law rules to determine

18  the relevant law to apply to the arbitration clause.  And under California's choice of law rules, it is

19  likely that the arbitration clause would be governed by either the law of the place where the contract

20  was made, or the law of the place where the contract was performed.  *See, e.g.*, Cal. Civ. Code §

21  1646 (West 2015).  It is quite possible then, that determining arbitrability could require the separate

22  application of the laws of every state where a TracFone class member signed up for, or received,

23  TracFone service.  At a minimum, this extra complexity further counsels in favor of settlement.

24         Additionally, Birner appears overly optimistic that the arbitration provision would be held

25  unenforceable under California law, at least in the most relevant respect.  Birner has not argued, and

26  indeed may be foreclosed from arguing that the class action waiver is not enforceable in light of the

27  Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1750 (2011).  In

28  order to avoid the class action waiver, Plaintiffs would need to show that the entire arbitration

agreement was "permeated" with substantive unconscionability on grounds not preempted by the FAA.  *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 122 (2000); *see also Mohamed v. Uber Techs., Inc.*, -- F. Supp. 3d --, 2015 WL 3749716, at *31 (N.D. Cal. 2015).  The only two putatively substantively unconscionable terms Birner identifies in the contract, however, a unilateral modification clause and punitive damages waiver, could arguably be severed from the agreement, leaving the class action waiver intact.  *See Armendariz*, 24 Cal. 4th at 121-23 (holding that California law favors "severing or restricting illegal terms rather than voiding the entire contract"); *see also Mohamed*, 2015 WL 3749716, at *25 (summarizing relevant principles of California law with respect to the severance of substantively unconscionable terms in arbitration provisions).  Put simply, there is substantial risk of lengthy and complicated litigation if this case is not settled, and a sizeable risk that such litigation could not be maintained as a class action and would instead be compelled to individual arbitrations.  Thus, the second *Churchill Village* factor strongly favors settlement.

            c.      <u>The Risk of Maintaining Class Action Status Throughout the Trial</u>

Plaintiffs would have the burden to show that a class action could be certified, and that certification could be maintained through trial.  The parties correctly argue that there are real risks that Plaintiffs could not meet that burden here.  Thus, the third *Churchill Village* factor weights in favor of settlement approval.

TracFone does not concede that a nationwide class could be certified here.  Indeed, TracFone argues that the laws of all fifty states necessarily would apply to Plaintiffs' claims, thus eviscerating predominance and manageability.  This is not a frivolous argument.  *See Zinser v. Accufix Research Inst. Inc.*, 253 F.3d 1180, 1190, *amended by and rehearing denied*, 273 F.3d 1266 (9th Cir. 2001) (recognizing that legal variation among the laws of the fifty states may provide a basis for denying class certification); *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1024 (11th Cir. 1996) (same); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741–43 and n. 15 (5th Cir.1996) (same); *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300–01 (7th Cir.1995) (same).

**United States District Court**
For the Northern District of California

Moreover, and even assuming that the law of only a few states might apply to Plaintiffs' claims, TracFone pointedly notes another significant obstacle to class certification – quantification of class members' damages.  As TracFone notes, the Supreme Court has recently held that a plaintiff seeking class certification must typically present an adequate model for determining damages on a classwide basis in order to satisfy Rule 23's predominance requirement.  *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013); *see also Newton v. Am. Debt Servs.*, No. C-11-3228 EMC, 2015 WL 3614197, at *8 (N.D. Cal. Jun. 9, 2015) (discussing *Comcast* and class certification requirements).  Here, however, TracFone argues that no common damages model could be fashioned because a class member's damages, if any, will depend on a number of individualized assessments.  For example, TracFone argues that the injury suffered by any class member could differ based on individualized variables such as: (1) the period over which the customer was throttled (*i.e.*, did throttling begin early in the month, mid-way through the month, or on the last day of the month?); (2) the customer's desired amount of data use (*i.e.*, did the user want to stream movies or music, or simply check emails or stock quotes?); and (3) throttling's ultimate impact on the user's functionality (*i.e.*, was the user's functionality only slightly impaired because their email use did not require particularly high data speeds, or was the class member's streaming video capability rendered essentially useless because the throttling speed limit was too low to permit streaming?).  Put simply, TracFone argues that an individual who only infrequently used data intensive features and was throttled towards the end of the month probably suffered substantially less damage from its throttling than did a data-hungry individual who wanted to stream movies or music via his TracFone device, but was prevented from doing so for a substantial portion of the month.  While these arguments might not ultimately foreclose class certification, they present real challenges that Plaintiffs would have to overcome were this Court to deny final approval. Accordingly, this factor favors final approval.

          d.      <u>The Amount Offered in Settlement</u>

As this Court recently explained in its opinion in *Bayat v. Bank of the West*, the most important variable in assessing a class settlement is the amount of relief obtained for the class. *Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015).

United States District Court

For the Northern District of California

Here, the settlement provides both monetary and injunctive relief to class members.  As described below, both forms of relief are valuable and substantial.  Thus, the most important *Churchill Village* factor weighs strongly in favor of final approval.

i.    <u>Monetary Relief</u>

TracFone largely sold its "unlimited" service plans for $45 a month during the class period. *See* Docket No. 121 at 16.  As the parties explained at the final approval hearing, TracFone's unlimited plan included not just "unlimited" data, but also unlimited voice calls and text messages. *See* Docket No. 151.  During the class period, TracFone also sold a more limited service plan for roughly $30 a month.  *See* Docket No. 134 at 4.  As explained at the hearing, this cheaper plan did not include unlimited voice calls, text messages, or data service.  Thus, it is reasonable to assume that the monetary value of the "unlimited" data service sold to consumers is equal to some portion (but not all) of the $15 monthly premium that class members paid to obtain unlimited talk, text, and data service.

The settlement provides that class members who were throttled before TracFone made certain disclosure changes will receive a *minimum* payment of $6.50, while customers who were throttled after TracFone allegedly made more fulsome disclosures will receive a *minimum* payment between $2.15-$2.50.  Docket No. 121 at 7.  For class members whose data service was suspended, the minimum payment is $10.  *Id*.  Plaintiffs whose service was terminated entirely will receive a guaranteed $65 payment.  *Id.* Critically, these minimum payment amounts assume a 100% claims rate.  If, as has turned out to be the case, the actual claims rate is below 100%, the per claimant payout rises according to a *pro rata* formula in the settlement agreement.  The parties contend that based on the estimated final claims rate of nearly 30%, individuals who were throttled will receive roughly $16 per claim, while claimants whose service was suspended will receive roughly $25.  *See* Docket No. 134 at 1.

Contrary to Objector Birner's arguments that the monetary relief obtained in this settlement is too low, the $40 million settlement represents a good monetary result for class members.  As noted above, the most reasonable approximate measure of the damages class members sustained is the additional amount of money customers paid for TracFone's "unlimited" data plan – an amount

United States District Court
For the Northern District of California

roughly equal to some unspecified portion of the $15 monthly premium class members were charged

for unlimited data, voice and text services.  Assuming for a moment that this entire $15 premium

could be attributed solely to TracFone's unlimited data service, the Court finds that a realistic

theoretical verdict value in this case would be roughly $120 million, which represents a $15 refund

for each of the approximately eight million class members for the first month their service was

throttled without forewarning or adequate disclosure.[3]  The $40 million settlement fund recovers

one-third of the theoretical verdict amount for class members – a very reasonable compromise in this

Court's experience.  More realistically, only a portion of the $15 premium is attributable to

unlimited data, and even then because the throttling occurred only when the ceiling on data usage

was reached, many users would not encounter throttling until the last days of the month.  This fact

suggests that assuming a full month's damage at the full $15 premium rate may well be a generous

assumption.

Birner's specific arguments regarding the alleged inadequacy of the monetary relief in this

settlement are all predicated on untenable assumptions, and must be rejected.  For instance, Birner

suggests that customers who were throttled should be refunded the full $45 monthly service fee they

paid TracFone for *every* month they subscribed to the unlimited data plan and were throttled, not just

for one (or at most two) months of service.  However, TracFone correctly points out that class

members who learned they had been throttled could have discontinued their service plans with no

penalty – TracFone users subscribe to the company's service on a month-to-month basis with no

obligation to renew.  Those individuals, like Birner himself, who kept renewing their TracFone

service month after month likely either (1) were not throttled or did not know they were throttled,

and thus likely suffered little or no legally cognizable injury, or (2) knew they were throttled and

continued to sign up for TracFone's service anyway.  TracFone makes a strong argument that when

such members willingly renewed their plans knowing that they were subject to throttling, they could

no longer claim that TracFone's marketing was materially misleading, deceptive, or injurious.

---

[3]  The Court assumes without deciding that class members would likely only recover damages for the first month they were throttled.  If a consumer continued to sign up for TracFone's service in subsequent months after learning of TracFone's throttling, such a consumer likely was not affirmatively misled by TracFone's allegedly deceptive advertisements.

1       Objector Birner's next argument, that payments between $2.15 and $6.50 to throttled class

2   claimants are "minimal, arbitrary, or *de minimus*," is equally off-point.  Birner fails to recognize that

3   these figures represent the *minimum* payments due under the settlement, assuming a 100% claims

4   rate.  Because the claims rate does not approach 100%, Birner's objection is largely irrelevant.  In

5   any event, and in light of the nearly 30% claims rate reported by the parties in their final approval

6   papers, the actual payments to throttled class members are expected to be approximately $16 each –

7   at least $1 *more* than a reasonable estimate of their actual damages (*i.e.*, the full $15 paid for

8   unlimited talk, text, and data).  *See* Docket Nos. 134 at 1, 139 at 1.  Clearly, this is a very good result

9   for class claimants.

10      Birner also wrongly argues that the $40 million settlement amount is too low because class

11  members would be entitled to a substantial restitution remedy if this case is not settled.  Essentially,

12  Birner argues that TracFone would be obligated to disgorge the entirety of the revenues it

13  wrongfully earned by allegedly misrepresenting the central feature of its unlimited data plan.  Birner

14  alleges that "simple math establishes that TracFone would be unjustly enriched or enjoy revenue,

15  based upon the $15.00 difference [in price between] the plans, between $14.6 billion to $18.3

16  billion."  Objection at 4.  There are a number of serious flaws in this calculation, including the fact

17  that Birner's "simple math" presumes that the entire class (and millions of non-class members, as

18  well) would be entitled to a full refund of $15 for every month during the years-long class period.

19  But even more fundamentally, Birner's unjust enrichment theory wrongly assumes that the entire

20  $15 payment TracFone received from class members would be subject to disgorgement to injured

21  class members, even though the actual benefit TracFone arguably received as a result of its

22  misrepresentations is likely only a portion of the $15 charge.  *See Day v. AT&T Corp.*, 63 Cal. App.

23  4th 325, 340 (1998) (explaining that a restitution award under the UCL has two predicates; "the

24  offending party must have obtained something to which it was not entitled *and* the victim must have

25  given up something which he or she was entitled to keep") (emphasis in original); *see also* Dan B.

26  Dobbs, *Law of Remedies: Damages-Equity-Restitution*, at § 4.1(4) (West 1993) (explaining how

27  restitution is typically calculated, and noting that restitution in an amount exceeding a plaintiff's

28  actual monetary losses is rarely awarded); Douglas Laycock, *The Scope and Significance of*

United States District Court
For the Northern District of California

*Restitution*, 67 Tex. L. Rev. 1277, 1289 (1989) (noting that courts typically only award restitution in an amount exceeding plaintiff's losses in cases where the defendant's conduct was particularly egregious, and further noting that even an award disgorging a defendant's profits is relatively rare). Allowing class members to recover the full $15 paid for each month they subscribed to TracFone's service would represent a significant windfall for class members; not a just measure of damages. Birner has simply not established that class members would obtain a significantly larger recovery under a restitution or unjust enrichment theory than they are receiving under the proposed settlement.

Birner's argument that class members could obtain punitive damages if they pursued this case through trial is similarly off-base.  As Plaintiffs point out, punitive damages are only available under one of the various statutes they sued under.  *See Clark v. Superior Court*, 50 Cal. 4th 605, 610 (2010) (holding that punitive damages are not available under California's Unfair Competition Law); *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Ct. App. 1984) (holding that punitive damages are not available under Florida's Deceptive and Unfair Trade Practices Act); *Crogan v. Metz*, 47 Cal. 2d 398, 405 (1956) (holding punitive damages are not available for breach of contract under California law); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1536 (11th Cir. 1985) (explaining that punitive damages are not available for breach of contract under Florida law).  And while punitive damages can theoretically be awarded under the CLRA, Birner has not cited any CLRA case where such damages were actually awarded, nor has Birner sufficiently demonstrated that TracFone's conduct here would warrant a punitive damages award under the CLRA.

Equally without merit is Birner's argument that the settlement does not adequately compensate those few class members whose service was entirely terminated.  Objection at 15.  As Birner explains, until late 2013 TracFone subscribers were required to purchase either locked handsets that worked only on TracFone's network, or locked SIM cards that would not work on other networks.  *Id.*  Consequently, the phones or SIM cards purchased by later-terminated class members could not be used with other wireless carriers, rendering those products useless. Birner alleges that the settlement does not adequately account for these class members' sunk costs.

TracFone notes that first-time customers could purchase a new TracFone-branded handset

United States District Court

For the Northern District of California

for as little as $5, or could purchase a locked SIM card for less than $16.  Docket No. 135 at 5.

Birner has not contradicted this point.  Importantly, claimants whose service was terminated receive

a guaranteed $65 payment under the settlement.  This payment is intended to provide compensation

both for the value of any data service that was lost, and for at least some portion of the cost of any

handset or SIM card that was purchased and then rendered worthless by TracFone's decision to

terminate service.  Birner's objection that claimants whose service was terminated do not receive

adequate compensation for their sunk equipment costs is not well taken.

Finally, Birner argues that the $40 million settlement amount is too low because TracFone

has the financial wherewithal to withstand a greater verdict.  However, "the fact that [the defendant]

could afford to pay more does not mean that it is obligated to pay any more than what the [plaintiffs]

are entitled to under the theories of liability that existed at the time the settlement was reached." *In

re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004).  More generally, it is not this

Court's role in reviewing a settlement to ensure the settlement is perfect, extracting every cent

possible from the defendant under the circumstances. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 819

(9th Cir. 2012).  Rather, this Court's job is simply to ensure the settlement is "fundamentally fair

within the meaning of Rule 23(e)." *Id.*  For the reasons described above, the monetary portion of

this settlement is very fair to class members by any measure and thus Birner's objection to the

monetary relief is without merit.

ii.   <u>Injunctive Relief</u>

In addition to the significant monetary relief available under the settlement, TracFone has

also agreed to make numerous conduct changes, including:

- TracFone will not advertise its mobile service plans as providing "unlimited" data
  unless it also makes clear in adjacent disclosures any applicable throttle limits or
  caps, as well as the actual speeds to which customer data will be slowed.

- TracFone's terms and conditions will be updated to describe the impact throttling can
  have on the functionality of services.

- TracFone will ensure that customers contacting TracFone customer service receive
  accurate information about TracFone's throttling, suspension, and service termination

policies, and about the impact throttling can have on the functionality of services.

- TracFone will implement a system to advise customers by SMS text message when their data speed has been throttled upon reaching specified data usage caps.

*See* Settlement Agreement at § IV.C.

The Court finds that the injunctive relief will have significant value for both class members and the general public.  Most importantly, the injunctive relief is designed to  make it clear to customers exactly what TracFone is selling when it advertises its "unlimited" data plans by forcing TracFone to better inform customers of its throttling, suspension, and service termination policies.

Further, TracFone customers will receive a text message when they are actually throttled. Customers who receive such a text message and dislike TracFone's throttling policy can choose not to renew their TracFone service the following month.

Birner argues that the conduct changes in the Settlement Agreement are "unenforceable window dressing" because the settlement does not provide for liquidated damages or the automatic imposition of specified monetary sanctions in the event that TracFone does not comply with the terms of the settlement.  Objection at 24.  Like many of Birner's other arguments, this objection is predicated on a fundamental misunderstanding of the facts or law.  As TracFone correctly point out, this Court retains jurisdiction over the Settlement Agreement and FTC Stipulated Order—if TracFone does not comply with the terms of the settlement, the Court can take appropriate remedial action.  There is absolutely no reason to suspect that the injunctive relief agreed to is merely "unenforceable window dressing."

In conclusion, the value of both the monetary and injunctive relief on offer in this settlement is very good, and well within the reasonable range of approvable outcomes when compared to the theoretical verdict value of these claims.  Thus the fourth *Churchill Village* factor tips strongly in favor of settlement approval.

e.      The Extent of Discovery Completed and the Stage of the Proceedings

The fifth *Churchill Village* factor favors approval of this settlement.  Declarations from class counsel reveal that they spent significant time litigating this matter before a settlement was reached. For instance, class counsel aver that they spent roughly 778 hours on pre-filing case investigation,

440 hours preparing for and taking depositions, and roughly 663 hours on other discovery. *See* Docket Nos. 143-46. Plaintiffs counsel have represented to the Court that they obtained sufficient information throughout the litigation process to make an informed decision about the settlement. *See id.* There is no reason to question counsels' assertion. Thus this factor weighs in favor of approval.

f.      The Experience and Views of Counsel

Class counsel have submitted declarations that indicate that all of the attorneys here have significant experience litigating and settling consumer class actions. *See, e.g.*, Docket Nos. 122-1 and 122-2. For instance, lead class counsel from the firm of Lieff, Cabraser, Heimann & Bernstein, LLP, are known to this Court to be skilled and experienced class action litigators. All counsel involved in this matter support the settlement. This factor weighs in favor of final approval.

g.      The Presence of a Governmental Participants

The FTC participated heavily in reaching this settlement, and supports the settlement. Indeed, the FTC will be responsible for the disbursement of the $40M settlement fund to class claimants. No government entity has raised any objections to the proposed settlement. This factor weighs in favor of final approval.

Birner argues that the FTC's presence in the settlement counsels *against* approval because, in Birner's view, the settlement was solely the work of the FTC. Essentially, Birner argues that the consumer actions added nothing to the settlement, and the $40 million paid to the FTC for the purpose of consumer redress should be viewed solely as consideration to settle the FTC enforcement action. According to Birner, consumers received nothing but "past consideration" in exchange for the release of their claims. Objection at 13.

Birner's argument is without merit. The consumer and FTC settlements were reached at the same time as part of a *global* settlement. TracFone has stated that it only agreed to pay $40 million to the FTC because those funds will be used to pay class members in the consumer cases, thereby resolving all of the pending lawsuits against it. Docket 113 at 2. Counsel for the FTC confirmed this point at the final approval hearing, as did Plaintiffs' counsel. The FTC's endorsement of the settlement counsels in favor of granting final approval.

United States District Court
For the Northern District of California

h.      The Reaction of the Class Members of the Proposed Settlement

As previously indicated, the parties estimate that there are approximately eight million members in the settlement class.  Over 800,000 of these individuals submitted claims, while only 142 opted out, and five objected to the settlement.  Docket Nos. 134-1; 139.  Additionally, the settlement provides that an additional 1.8 to 1.9 million customers for whom TracFone has address information will automatically receive a check, even if they did not affirmatively file a claim.  Taken together, and depending on the extent of the overlap between the those class members who will automatically receive a payment and those who filed claims, the total claims rate is estimated to be approximately 25-30%.  This is an excellent result that counsels in favor of settlement approval. *See, e.g.*, *Bayat*, 2015 WL 1744342 at \*5-6 (approving class action settlement with 2% claims rate); *Evans v. Linden Research, Inc.*, No. C-11-1078 DMR, 2014 WL 1724891, at \*4 (N.D. Cal. Apr. 29, 2014) (approving class action settlement with 4.3% claims rate).

i.      *In re Bluetooth* Factors

When a settlement agreement is negotiated prior to formal class certification, the district court must evaluate the settlement for three additional signs of collusion between class counsel and the defendant:

> (1) do counsel receive a disproportionate distribution of the settlement, or does the class receive no monetary distribution while class counsel are amply rewarded;
>
> (2) is there a "clear sailing"  arrangement providing for the payment of attorneys' fees separate and apart from class funds . . . ; and
>
> (3) do any attorneys' fees not awarded to class counsel revert to defendants instead of being added to the class fund.

*See In re Bluetooth*, 654 F.3d at 946-47 (citations omitted).

Here, two of the three *Bluetooth* signs weigh against settlement approval.[4]  Specifically, the settlement has a "clear sailing" agreement whereby fees will be paid separate and apart from class

---

[4]  The first *Bluetooth* factor is not met.  As described below, the $5 million fees request does not represent a disproportionate portion of the settlement.  Rather, the fees awarded represent 11% ($5M/$45M) of total settlement amount.  This figure is particularly reasonable in light of the 25% benchmark for fees awards in the Ninth Circuit. *See Hanlon*, 150 F.3d at 1029.  The requested fee is even more reasonable in light of the positive value of the injunctive relief obtained on behalf of class members.

1    funds, and TracFone has agreed not to challenge class counsels' fees request up to $5 million.  *See*

2    Settlement Agreement § IX.A ("Defendants agreed not to oppose . . . (a) $5 million attorneys' fees;

3    and (b) $100,000 litigation expense.").  Moreover, any fees not awarded to class counsel will revert

4    to TracFone rather than being added to the $40 million settlement fund.  The presence of these

5    factors is in no way dispositive, however.  As the *Bluetooth* opinion itself makes clear, the *Bluetooth*

6    factors are merely "warning signs" that indicate the *potential* for collusion.  *See In re Bluetooth*, 654

7    F.3d at 947.  When faced with such "indicia of possible implicit collusion," the Court need not reject

8    the settlement outright.  *Id.*  Rather, the Court is merely obligated to "assure itself that the fees

9    awarded in the agreement were not unreasonably high" in light of the results obtained for class

10   members.  *Id.*

11        In the case at bar, the requisite "hard look" at the settlement indicates that the requested fees

12   award is not "unreasonably high" in light of the significant relief obtained for the class.  Indeed, as

13   noted above, every single *Churchill Village* factor weighs in favor of final approval, and the most

14   important factor – the amount received in settlement – is undoubtedly favorable.  Moreover, it is

15   worth noting that the particular settlement structure present here was mandated by the FTC, which

16   prohibited the use of any settlement funds to pay attorney fees, litigation expenses, court costs, or

17   incentive payments to class representatives.  Stipulated Order § III.A.  Thus, the settlement displays

18   the second *Bluetooth* "warning sign" because the FTC required the payment of attorneys' fees

19   "separate and apart from class funds."  *In re Bluetooth*, 654 F.3d at 947.  Significantly, the $40

20   million settlement fund is not subject to reversion to the Defendant; all of it will be distributed to

21   class members.  Thus, the Court will grant final approval to this settlement despite the presence of

22   two of *Bluetooth*'s three warning signs.

23                    j.     Conclusion

24        All of the *Churchill Village* factors weigh in favor of final approval and a finding that the

25   proposed settlement is fair, reasonable, and adequate.  And while two of the *Bluetooth* warning signs

26   are present, the settlement appears to present a good deal for class members when viewed as a

27   whole.  Consequently, the Court **GRANTS** the motion for final approval.

28

17

**United States District Court**
For the Northern District of California

B.       Objector Birner Lacks Standing to Object to the Settlement

The Court has considered and rejected Birner's various objections to the proposed settlement on the merits, as indicated above and in the Court's oral ruling at the final approval hearing.  In any event, the Court finds that Birner has no legal standing to object to the settlement because he has not demonstrated that he is an aggrieved class member.  *See In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.* (*In re First Capital*), 33 F.3d 29, 30 (9th Cir. 1994) (holding that only "an aggrieved class member" has standing to object to a proposed class settlement); *see also San Francisco NAACP v. San Francisco Unified School Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) (noting that "nonclass members have no standing to object to the settlement of a class action) (citation omitted).  The burden is on Birner to prove that he has standing to object (*i.e.*, that he is an aggrieved class member).  *See In re Apple Inc. Sec. Litig.*, No. 06-cv-5208-JF, 2011 WL 1877988, at *3 n.4 (N.D. Cal. May 17, 2011); *In re Hydroxycut Mktg. and Sales Practices Litig.*, No. 09-cv-1088 BTM, 2013 WL 5275618, at *2 (S.D. Cal. Sep. 17, 2013) ("The party seeking to invoke the Court's jurisdiction – in this case, the Objectors – has the burden of establishing standing.") (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998)).

Birner has not met his burden to establish that he is an aggrieved class member.  The closest Birner has come is his unsupported assertion that he believes he was throttled because his data service was often slow.  *See* Docket No. 136-1 (Birner Depo.) at 34:8-35:12.  But as the parties to this litigation agree, a cell phone user's data speed can be affected and slowed by numerous factors unrelated to deliberate throttling, such as poor cell reception or differing network speeds (*e.g.*, 3G vs. 4G).  *See* Docket No. 137-1 at ¶ 16.

In contrast to Birner's weak showing on standing, TracFone has submitted probative evidence that Birner is *not* a class member.  Specifically, a TracFone employee submitted a declaration under penalty of perjury that states that (1) "TracFrone keeps record of all accounts that were throttled, suspended, or terminated at TracFone's direction"; and (2) those records establish that Birner's account was never throttled, suspended, or terminated because he "never consumed enough data in a single 30-day period to be subject to throttling, suspen[sion], or termination." Docket No. 137-1 at ¶¶ 13-14.  Birner has presented no evidence that seriously contradicts

United States District Court

For the Northern District of California

1  TracFone's assertion that he is not a class member.  Thus, the Court finds that Birner lacks standing

2  to object to the proposed settlement because he is not a class member, and certainly is not an

3  aggrieved class member.[5]  *See In re First Capital*, 33 F.3d at 30 ("Simply being a member of a class

4  is not enough to establish standing.  One must be an aggrieved class member.").  Nonetheless, the

5  Court has treated Birner as *amicus curiae* and given full consideration to his arguments.

6  C.    Motion for Attorneys' Fees and Class Representative Incentive Awards

7          1.    Legal Standards for an Award of Attorneys' Fees

8          The Ninth Circuit has held that in a class action "the district court must exercise its inherent

9  authority to assure that the amount and mode of payment of attorneys' fees are fair and proper."

10 *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328 (9th Cir. 1999).  The district court's

11 duty to "carefully assess the reasonableness of a fee amount spelled out in a class action settlement

12 agreement," *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003), exists "independently of any

13 objection" to the fee amount requested.  *Zucker*, 192 F.3d at 1328-29.

14         In common-fund cases like this one, "the district court has discretion to use either a

15 percentage or lodestar method" when determining the appropriate amount of attorneys' fees.

16 *Hanlon*, 150 F.3d at 1029; *see also In re Bluetooth*, 654 F.3d at 942.  If the court selects the

17 percentage method, "[t]his circuit has established 25% of the common fund as a benchmark award

18 for attorney fees."  *Hanlon*, 150 F.3d at 1029 (citation omitted).  If the court selects the lodestar

19 method, the court "begins with the multiplication of the number of hours reasonably expended by a

20 reasonable hourly rate."  *Id.* (citation omitted).  The lodestar figure may then be "adjusted upward or

21 downward to account for several factors including the quality of the representation, the benefit

22 obtained for the class, the complexity and novelty of the issues presented, and the risk of

23 nonpayment."  *Id.* (citation omitted).  Regardless of which method the court chooses, the Ninth

24 Circuit has "encouraged courts to guard against an unreasonable result by cross-checking their

25 _____

26         [5]  Birner filed a motion to continue the final approval hearing in this case so that he could
   review the discovery provided to him for the purpose of learning whether he is actually a class
27 member.  Docket No. 141.  The Court denied Birner's motion, finding that Birner had made an
   insufficient showing that it was likely that he would ever find evidence in the discovery provided to
   him that contradicts TracFone's direct assertion that he was never throttled, even if the Court
28 permitted Birner extra time to review or conduct such discovery.

United States District Court

For the Northern District of California

1    calculations against a second method." *In re Bluetooth*, 654 F.3d at 944.  Ultimately, "courts aim to

2    tether the value of an attorneys' fees award to the value of the class recovery." *In re HP Inkjet*

3    *Printer Litig.*, 716 F.3d at 1178 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).  "The more

4    valuable the class recovery, the greater the fees award.  And vice versa." *Id.* at 1178-79 (citation

5    omitted); *see also Hensley*, 461 U.S. at 436 (instructing district courts to "award only that amount of

6    fees that is reasonable in relation to the results obtained").

7          2.    Merits of the Request for Attorneys' Fees

8          Class counsel requests an attorneys' fees award of $5 million, which represents 11% ($5

9    million/$45 million) of the total settlement value.  This is well below the 25% benchmark typically

10   awarded in common fund cases in the Ninth Circuit.  *See Hanlon*, 150 F.3d at 1029.  As discussed

11   above, class counsel obtained excellent relief for the class.  They are therefore entitled to a

12   reasonable fee to compensate them for their successful efforts. *See Hensley*, 461 U.S. at 436.  The

13   Court readily concludes that a contingency award is appropriate in this case, and further concludes

14   that an award of roughly 11% of the common fund amount is reasonable in light of the superb results

15   obtained by class counsel here.

16         Moreover, the $5 million fees request is easily justified under the lodestar cross-check.  Here,

17   class counsel spent more than 5,000 hours litigating this case, running up approximately $3 million

18   in legal fees.  The Court requested supplemental briefing from class counsel regarding their lodestar

19   billings, and the Court has reviewed class counsels' supplemental filings.  The Court is satisfied that

20   class counsels' lodestar figure is justified in light of the complexity and duration of this litigation.

21         The $5 million fees award sought represents a positive lodestar multiplier of about 1.7.  As

22   noted, courts have discretion to apply a positive multiplier after considering factors such as: the

23   quality of representation, the benefit obtained for the class, the complexity and novelty of the issues

24   presented, and the risk of nonpayment. *See Van Vranken v. Atl. Richfield* Co., 901 F. Supp. 294, 298

25   (N.D. Cal. 1995) (providing that the district court may "enhance the lodestar with a 'multiplier,' if

26   necessary to arrive at a reasonable fee in light of all of the circumstances of the case"); *In re*

27   *Washington Public Power Supply Sys. Securities Litig.*, 19 F.3d 1291, 1299-1300 (9th Cir. 1994)

28   (explaining that a positive lodestar multiplier is appropriate to compensate counsel for the risk of

non-payment in a contingency fee case). All of these factors warrant a positive multiplier here, and the precise multiplier (1.7) is well within the range approved in the Ninth Circuit in other successful class actions. *See, e.g. Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (approving a 3.65 multiplier on lodestar); *Van Vranken*, 901 F. Supp. at 298-99 (N.D. Cal. 1995) (multiplier of 3.6).  Thus the Court **GRANTS** the motion for attorneys' fees, and awards class counsel the full amount of fees sought, as well as the full amount of litigation costs requested.

       3.    <u>Class Representative Service Awards</u>

       The $2,500 incentive awards sought for the named plaintiffs are reasonable and approved.  In the Ninth Circuit, "named plaintiffs . . . are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977.  Such awards are intended to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-959 (9th Cir. Cal. 2009).

       According to the Plaintiffs' attorneys, in addition to lending their names to these cases, and thus subjecting themselves to public attention, the named Plaintiffs here were actively engaged in the prosecution and settlement of these actions. *See* Docket No. 122 at 20.  Among other things, they "provided information to Class Counsel, gathered documents, reviewed pleadings, stayed updated about the litigation, reviewed and approved the proposed Settlement, and, in the case of one plaintiff, had their deposition taken." *Id.*  The $2,500 awards requested are reasonable, especially in light of other cases where similar or larger incentive awards have been awarded to named class plaintiffs. *See, e.g.*, *Nwabueze v. AT & T Inc.*, No. C 09–1529 SI, 2013 WL 6199596, at *12 (N.D. Cal. Nov. 27, 2013) (awarding $5,000 incentive payment for each of two named plaintiffs); *Hopson v. Hanesbrands, Inc.*, No. CV–08–844 EDL, 2009 U.S. Dist. LEXIS 33900, at *27–28, 2009 WL 928133 (N.D. Cal. Apr. 3, 2009) (noting that "courts have found that $5,000 incentive payments are reasonable") (citations omitted).

### III.   <u>CONCLUSION</u>

       For the reasons explained above and on the record at the final approval hearing, the Court grants final approval to the proposed class action settlement.  The Court also grants class counsel $5

United States District Court<br>For the Northern District of California

United States District Court

For the Northern District of California

million in attorneys' fees, and $63,644.75 in costs.  Finally, the Court grants the request for $2,500 incentive awards for the named plaintiffs.  The Court overrules all objections on the merits, and further concludes that Objector Birner lacked standing to object in the first instance.

This order disposes of Docket Nos. 121 and 122.  The Clerk is directed to close the file in this case, along with the file in the following cases:  *Browning v. TracFone Wireless*, No. 14-cv-1347-EMC; *Blaqmoor v. TracFone Wireless*, No. 13-cv-5295-EMC; *Gandhi v. TracFone Wireless*, No. 13-cv-5296-EMC; and *Federal Trade Commission v. TracFone Wireless*, No. 15-cv-392-EMC.

IT IS SO ORDERED.

Dated:  July 2, 2015

_____
EDWARD M. CHEN
United States District Judge